**Not for Publication**

## UNITED STATES DISTRICT COURT
## THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| **MAQBOOL PARACHA and LUBNA PARACHA** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Civil Action No.: 20-4902 (ES) (JRA)** |
| **v.** | : | |
| | : | **OPINION** |
| **DARLING INGREDIENTS INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**SALAS, DISTRICT JUDGE**

Before the Court is Defendant Darling Ingredients Inc.'s ("Darling") motion to dismiss the Second Amended Complaint (D.E. No. 37 ("SAC")) of Plaintiffs Maqbool and Lubna Paracha. (D.E. No. 39).[1]  Having considered the parties' submissions, the Court decides this matter without oral argument.  *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).  For the following reasons, the motion is GRANTED.  The SAC is dismissed *without prejudice*.

## I.  BACKGROUND

As alleged in the SAC, Maqbool was an assistant plant manager at Darling, a company in the business of collecting and recycling animal processing by-products.  (SAC ¶¶ 3 & 5).  Maqbool was responsible for overseeing an entire plant located in New Jersey and ensuring plant equipment was sanitary and in good repair.  (*Id.* ¶ 6).  To that end, Maqbool helped maintain large condenser fans, also known as "Voss Condenser Fans," which were located on the roof of the New Jersey plant.  (*Id.* ¶¶ 6–7).  The blades on the fans were large, approximately eight feet long, and the fans

---

[1]  Plaintiffs are husband and wife and will hereinafter be referred to by their first names.

"[we]re temperature controlled and automatically turn[ed] on every time a condenser hit[] sixty-five (65º) degrees." (*Id.* ¶ 10). To prevent the fan from automatically turning on—for example, in order to conduct a repair—the "condenser must be completely de-energized." (*Id.*).

On April 20, 2018, Maqbool suffered injuries while attempting to repair a fan. (*Id.* ¶¶ 12–14). Plaintiffs now bring claims of negligence and loss of consortium against Darling. This case originated in the Superior Court of New Jersey, Middlesex County, but Darling removed the matter to federal court based on diversity jurisdiction. (D.E. No. 1, Notice of Removal ¶¶ 2 & 8–14). Darling then moved to the dismiss the Complaint. (D.E. No. 4). But the motion was thereafter administratively terminated because Plaintiffs had indicated they would amend. (D.E. No. 11). Plaintiffs filed the First Amended Complaint. (D.E. No. 12 ("FAC")).[2] And Darling again moved to dismiss. (D.E. No. 17).

The Court granted Darling's the motion and dismissed the FAC without prejudice. (D.E. No. 34 ("Opinion")).[3] As previously construed by the Court, the FAC had alleged that when repairing a fan

> Darling . . . requires employees to deenergize the condenser personally, prior to conducting any repairs on the fan. But because the fans are on the roof, and because the control room is not, Darling allegedly "created an alternative method, to avoid delays." That method allowed an employee to wait on the roof while a second employee deenergized the condenser from the control room and informed the first employee of such through a two-way radio.

(*Id.* at 2). Plaintiffs further alleged that on the day of the accident, Maqbool followed the "alternative method": Maqbool entered a fan after receiving clearance from a co-worker over the two-way radio, and he was struck by the fan after it energized and turned on. (*Id.*). Plaintiffs also

---

[2]     Plaintiffs also asserted products liability claims against Siemens Corporation in the FAC, the manufacturer of the fans, which were dismissed by stipulation. (D.E. No. 31).

[3]     *Paracha v. Darling Ingredients Inc.*, No. 20-4902, 2021 WL 1051728 (D.N.J. Mar. 19, 2021)

alleged that Darling had, before the accident, (i) disconnected a vibration switch that automatically shut off the fans after they went off balance; (ii) failed to replace a broken guard that prevented people from getting into the fans; and (iii) initiated an electrical bypass on the fans, which ensured the fans were always on and functioning but prevented employees from manually turning them off from the roof. (*Id.* at 2–3). Plaintiffs alleged that Darling received safety complaints from workers about the location of the fans, the broken guard, the vibration switch, and the electrical bypass. (*Id.* at 3). Finally, Plaintiffs alleged that the Occupational Safety and Health Administration ("OSHA") cited Darling for the accident. (*Id.*).

In its prior Opinion, the Court explained that Darling was immune from suit under the New Jersey Workers' Compensation Act ("WCA"), N.J.S.A. § 34:15-8, because Plaintiffs did not plausibly allege that Darling committed an "intentional wrong" that caused Maqbool's injuries, as is required to overcome Darling's immunity. (*Id.* at 4–10). An "intentional wrong," the Court explained, must one that (i) creates a "virtual certainty" of bodily injury or death and (ii) causes an injury (a) that is not merely a fact of life in industrial employment and (b) that is plainly beyond anything the legislature intended to immunize. (*Id.* at 5). Second, the Court found that Plaintiffs' allegations concerning the broken guard and disconnected vibration switch were irrelevant because Maqbool's injuries, as alleged, did not have anything to do with either. (*Id.* at 7–8). Third, the Court explained that Plaintiffs' relevant allegations were as follows:

> Darling (i) prevented employees from turning off the fans while on the roof; (ii) permitted employees to rely on one another to deenergize the condenser prior to working on the fan; (iii) received complaints from employees in the preceding years about the location of the fans and their inability to manually turn them off while on the roof; and (iv) received an OSHA citation for Maqbool's accident.

(*Id.* at 8).  Fourth, the Court found that those allegations, taken as true, failed to overcome Darling's immunity from suit.  (*Id.* at 8–10).  The Court specifically stated that "the FAC d[id] not explain *how* these facts make it such that the alternative method to deenergizing the condensers"— whereby two employees work together through a two-way radio—"created a virtual certainty of injury."  (*Id.* at 8 (emphasis in original)).  The Court also explained that "[t]he FAC claim[ed] the accident occurred because of the negligent act of a co-worker," and the Court found that "[a] co-worker's negligent act is . . . a well-known risk in working in a plant or factory."  (*Id.* at 9).  The Court dismissed the FAC without prejudice.

On May 19, 2021, Plaintiffs filed the SAC.[4]  In an attempt to cure their prior pleadings, Plaintiffs maintain that Darling employees followed the following "practice and procedure" when repairing the fans:

> [T]he employee assessing and making such repair waited on the roof with the Fan while a second employee in the control room deenergized the Fan.  After confirmation from the co-worker in the control room that the Fan was de-energized, the employee working on the Fan from the roof would also disconnect and lock the fan before commencing his/her work.  The ability to disconnect and lock the Fan is meant to add a layer of protection to any employee, including Mr. Paracha, while working on the Fan to ensure that the Fan would not reenergize.  This process was referred to as Defendant Darling's "Lock Out/Tag Out Procedure."

(SAC ¶ 11).  There thus appears to have been two steps: first, a co-worker deenergizes the fan from the control room; second, the repairperson locks and disconnects the fan from the roof.  (*Id.*).

Maqbool was injured after following that procedure on April 20, 2018.  (*Id.* ¶¶ 12–14).  In particular, while Maqbool was on the roof prepared to fix a leak in a fan, a fellow employee indicated that he deenergized the fan from the control room.  (*Id.* ¶ 12).  Maqbool visually

---

[4]     As in the FAC, Plaintiffs assert claims against Siemens Corporation in the SAC.  However, the docket does not reflect that Siemens Corporation was served with the SAC, Siemens Corporation has not responded to the SAC, and the parties say nothing about the claim(s) against Siemens Corporation in the SAC.

confirmed that the fan blades stopped, and Maqbool disconnected and locked the fan from the roof. (*Id.*).  But while repairing the fan, the fan energized and struck Maqbool, causing him severe and permanent injuries.  (*Id.* ¶¶ 13–14).

According to Plaintiffs, the Lock Out/Tag Out Procedure did not work because Darling effectively disabled the second step of the procedure—whereby the employee on the roof, who in this case was Maqbool, locked and disconnected the fan.  (*Id.* ¶¶ 17(c)–18).  Indeed, Darling had employees install "electrical bypasses," which (for unknown reasons) effectively disabled the fan disconnects.  (*Id.* ¶ 18).  And Darling effectively disabled the fan disconnects to obviate the need to conduct expensive repairs and to ensure "the Fans were always on and functioning" and would "run without interruption to Darling's business."  (*Id.* ¶ 17(c)).  Plaintiffs further allege that, "due to the nature of the electrical bypass," Maqbool "could not visually confirm which Fans (there were six in total on the roof) had an electrical bypass and which did not."  (*Id.* ¶ 18).

Plaintiffs claim that Maqbool should have "retain[ed] sole control" over disconnecting or deenergizing the fan so that he would have "know[n] with certainty that the Fan was off and would not activate when working on same."  (*Id.* ¶ 21).  They allege that "[f]an disconnects are a recommended and necessary safety feature for every fan" and "provide the best protection against accidental start-up during service or inspection."  (*Id.* ¶ 17(c)).  "The very purpose of the employee's ability to disconnect and lock the Fan directly on the roof was to add a layer of protection to the employee working on the Fan from the roof, should there be the occasion where the Fan is not properly deenergized from the control room."  (*Id.* ¶ 20).

Plaintiffs allege that Darling was on notice of the danger posed by the electrical bypasses and the fans.  They claim that, prior to the incident, Maqbool and other employees complained about the location of the fans and the use of electrical bypasses.  (*Id.* ¶ 23).  And for about three or

four years prior to the incident, employees had requested, out of concern for their safety, that the fans be replaced because of their safety conditions and age, the latter of which caused the fans not to operate as expected.  (*Id.* ¶ 24).

Finally, Plaintiffs allege that OSHA cited Darling for the incident.  (*Id.* ¶ 25).  Specifically, they claim that OSHA cited Darling "for a serious type violation, per 29 CFR 1910.147(a)(2)(ii)(B): 'an employee was required to place a part of his or her body into an area on a machine or piece of equipment where work was actually performed upon the material being processed (Point of operation) or whereas associated danger zone existed during a machine operating cycle.'" (*Id.*).  The OSHA investigation allegedly ended in a settlement whereby Darling agreed, among other things, to pay a fine and "to develop and implement a written procedure for accessing and locking out the roof mounted condenser fans and to include employee training." (*Id.* ¶ 28).

Darling moves to dismiss the SAC, arguing that Plaintiffs failed to cure the deficiencies outlined in the Court's previous Opinion.  (D.E. No. 39-2 ("Mov. Br.")).  The Court agrees.

## II.   LEGAL STANDARD

In assessing whether a complaint states a cause of action sufficient to survive dismissal under Rule 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  "[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are all disregarded. *Id*. at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).  The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and a claim is facially plausible when the plaintiff "pleads factual content that allows the court to

6

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III.    DISCUSSION

Enacted in 1911, the WCA "accomplished a 'historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment.'" *Van Dunk v. Reckson Assocs. Realty Corp.*, 45 A.3d 965, 970–71 (N.J. 2012) (quoting *Millison v. E.I. du Pont de Nemours & Co.*, 501 A.2d 505, 512 (N.J. 1985)). "When, by either express or implied agreement, the parties have accepted the provisions of the [WCA], the agreement operates as an employee's surrender of other forms of remedies." *Id.* at 971 (citing N.J.S.A. § 34:15-8).  "In exchange for immunity from liability, the [WCA] requires the employer to provide swift and certain payment, without regard to fault, to employees for workplace injuries." *Id.*  Importantly, the remedies under the WCA are exclusive, unless an employee's injuries were caused by an "intentional wrong" committed by his or her employer. *See Mull v. Zeta Consumer Prod.*, 823 A.2d 782, 783 (N.J. 2003).  Indeed, the WCA provides, in pertinent part, that "[i]f an injury or death is compensable under this article," an employer "shall not be liable to anyone at common law or otherwise on account of such injury or death . . . , except for intentional wrong."  N.J.S.A. § 34:15-8.

The WCA does not itself define "intentional wrong."  But in interpreting that term, the New Jersey Supreme Court has defined two conditions that must be satisfied "in order for an employer's act to lose the cloak of immunity":

> (1) the employer must know that his actions are substantially certain
> to result in injury or death to the employee, and (2) the resulting

> injury and the circumstances of its infliction on the worker must be
> (a) more than a fact of life of industrial employment and (b) plainly
> beyond anything the Legislature intended the Workers'
> Compensation Act to immunize.

*Laidlow v. Hariton Mach. Co.*, 790 A.2d 884, 894 (N.J. 2002); *accord Van Dunk*, 45 A.3d at 973.

The first condition is the "conduct prong," and the second condition is the "context prong." *See*

*Van Dunk*, 45 A.3d at 973. These prongs, the New Jersey Supreme Court has said, present

"formidable" standards. *Id.* at 966.

      With respect to the conduct prong, "[m]ere knowledge by an employer that a workplace is

dangerous does not equate to an intentional wrong." *Id.* at 978. In other words, negligent or

reckless conduct does not satisfy the conduct prong. *See Millison*, 501 A.2d at 514. Instead, "[a]n

intentional wrong must amount to a virtual certainty that bodily injury or death will result." *Van

Dunk*, 45 A.3d at 978. In determining whether that was the case, the fact finder must consider the

totality of the circumstances, including the circumstances of the accident, the employer's

involvement in it, prior accidents or close calls involving the same or similar circumstances,

previous complaints of employees, defective safety devices and the employer's knowledge of such

defects, safety devices that had been modified as more dangerous to enhance profit, past OSHA

citations for same or similar conduct, and the employer's purposeful deceit of OSHA regulators.

*Id.* at 978–79 (collecting cases). Ultimately, and it bears emphasis, these factors are to determine

whether there was a virtual certainty of injury, not whether there was an "exceptional wrong," a

"reckless act," or "gross negligence." *Id.* at 979.

      The context prong is "related" to, and often "overlap[s] to a great degree" with, the conduct

prong. *Id.* Indeed, "the same facts and circumstances generally will be relevant to both prongs."

*Crippen v. Cent. Jersey Concrete Pipe Co.*, 823 A.2d 789, 796 (2003). However, the context prong

presents a question of law for a court, "as the gatekeeper policing the [WCA's] exclusivity

requirement," to determine whether "an employee's injury and the circumstances in which the injury is inflicted are 'plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the [WCA].'"  *Van Dunk*, 45 A.3d at 980 (quoting *Millison*, 501 A.2d at 514).

Darling argues that the SAC fails to plead the conduct and context prongs and does not cure the deficiencies outlined in the Court's prior Opinion.  Darling argues that the SAC fails to "allege that the fan could not have been completely de-energized from the control room by his co-worker, if done correctly."  (Mov. Br. at 5–6; *see also id.* at 21).  The presence of electrical bypasses, Darling argues, "had no bearing on whether the fan was properly de-energized from the control room" and thus did not create a virtual certainty of injury.  (*Id.* at 23; *see also id.* at 24–25).  And whether a procedure could be safer is irrelevant so long as the procedure in place did not create a virtual certainty of injury.  (*Id.* at 21 & 23–24).  Darling argues that the SAC, like the FAC, merely alleges an accident caused by the negligent act of a co-worker—a well-known risk to industrial life.  (*Id.* at 26–27).

Plaintiffs respond by repeating the allegations in the SAC and purporting that "[t]his is not an action about a co-worker's negligence."  (D.E. No. 42 ("Opp. Br.") at 12).  The SAC makes clear, according to Plaintiffs, that "the employee from the control room confirmed the fan was deenergized" and that Maqbool "witnessed the fan blades turn off."  (*Id.* at 12 n.3 (citing SAC ¶ 12)).  Instead, this case, Plaintiffs say, "is about an employer who rather than incur the cost and time to replace broken parts of their fans, directed the installation of electrical bypasses which made it virtually impossible for an employee to ensure the fan would not reenergize while working on it."  (*Id.* at 12).  Plaintiffs argue that the SAC details (i) "why the safety feature of a fan disconnect is not only important, but critical, to the safe operation of the fan"; (ii) "the overzealous

monetary incentives of Defendant in permitting electrical bypasses of the fan disconnects"; and (iii) "how a functional disconnect would have prevented his accident." (*Id.* at 13).

The Court agrees with Darling: The SAC cures neither of the Court's central holdings in dismissing the FAC.

The Court found the FAC deficient under the "conduct prong" for failing to explain how "the alternative method to deenergizing the condensers"—whereby two employees work together through a two-way radio—"created a virtual certainty of injury." (Opinion at 8). The SAC does not cure that defect. Instead, the SAC appears to concede the opposite: "[t]he very purpose of the employee's ability to disconnect and lock the Fan directly on the roof was to *add* a layer of protection to the employee working on the Fan from the roof, *should there be the occasion where the Fan is not properly deenergized from the control room*." (SAC ¶ 20 (emphasis added)). The SAC does not allege why or how the process of deenergizing the fan from the control room created a virtual certainty of injury. Instead, Plaintiffs insist there should have been an additional layer of protection. (*Id.* ¶¶ 11–12 & 20).

Similarly, the SAC does not sufficiently allege the "context prong," because the SAC, like the FAC, still alleges that "the accident occurred because of the negligent act of a co-worker." (Opinion at 9). As the Court previously observed, "[a] co-worker's negligent act is . . . a well-known risk in working in a plant or factory." (*Id.* (citing *Calavano v. Fed. Plastics Corp.*, No. A-0353-09T1, 2010 WL 3257784, at *6 (N.J. Super. Ct. App. Div. Aug. 18, 2010))). While Plaintiffs claim there was no negligence on the part of Maqbool's co-worker because he witnessed the fan blades stop, the SAC indicates that disconnecting and locking the fan would only have added another layer of protection in the event the fan was "not properly deenergized from the control room." (SAC ¶ 20). If the accident occurred because the deenergizing process was faulty—

because it did not or could not work as a result of something other than a co-worker's negligence—then Plaintiffs must plead as much.

The Court will permit Plaintiffs one final opportunity to amend their pleadings to plausibly allege that the procedure allegedly in place at the time of the accident, whereby one employee relied on another to deenergize the fan from the control room, constitutes an intentional wrong under New Jersey law.[5]

## IV.   CONCLUSION

Based on the foregoing, the Court GRANTS the motion to dismiss the SAC.  (D.E. No. 39).  The SAC is dismissed *without prejudice*.  An appropriate Order will be entered.

Dated: March 29, 2022

Esther Salas, U.S.D.J.

---

[5]     Darling also argues that the SAC inappropriately contradicts the FAC.  (Mov. Br. at 2–4).  Darling primarily points out two inconsistencies.  First, the FAC alleged that time constraints required Maqbool to deviate from Darling's procedure and use a two-way radio system.  (*Id.* at 2–3).  Now, the SAC ignores the existence of time constraints and instead says that Maqbool followed Darling's mandated procedure.  (*Id.*).  Second, the FAC alleged that the Lock Out/Tag Out Procedure required Maqbool to deenergize the fan himself from the control room.  (*Id.* at 3–4).  Now, the SAC alleges that the Lock Out/Tag Out Procedure required a co-worker to deenergize the fan from the control room and Maqbool to lock and disconnect the fan from the roof, which Maqbool could not effectively do because of the presence of electrical bypasses.  (*Id.*).  Plaintiffs respond that the SAC "simply offers more detail to explain how and why the accident occurred."  (Opp. Br. at 1).

The Court agrees with Darling that allegations in a pleading constitute "binding judicial admission[s]."  *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 181 (3d Cir. 2008) (citing *Parilla v. IAP Worldwide Serv., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004) ("Judicial admissions are formal concessions in the pleadings, or stipulations by the party or its counsel, that are binding upon the party making them.")).  However, even if the FAC and SAC are inconsistent in the above two respects, those inconsistencies would be immaterial at this stage of the litigation.  It remains that in both pleadings Plaintiffs' theory is that Maqbool should have been able to personally disconnect the fan from the roof but instead, pursuant to a policy and practice of Darling at the time, needed to rely on a co-worker to deenergize the fan from the control room.  Plaintiffs' central theory has so far been consistent.  It also remains that Plaintiffs' theory is deficient because they have failed to plead how the alternative procedure in place constituted an intentional wrong.

11