Not for Publication

UNITED STATES DISTRICT COURT
THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MAQBOOL PARACHA and LUBNA PARACHA<br><br>Plaintiffs,<br><br>v.<br><br>DARLING INGREDIENTS INC.,<br><br>Defendant. | Civil Action No.: 20-4902 (ES) (JRA)<br><br>OPINION |

**SALAS, DISTRICT JUDGE**

Before the Court is Defendant Darling Ingredients Inc.'s ("Darling") motion to dismiss the Third Amended Complaint (D.E. No. 58 ("TAC")) of Plaintiffs Maqbool and Lubna Paracha.[1] (D.E. No. 83 ("Motion")). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the following reasons, the motion is **GRANTED**. The TAC is dismissed *with prejudice*.

**I.      BACKGROUND**

**A.      Factual Background**

As alleged in the TAC, since at least 1991, Maqbool worked as an assistant plant manager at Darling, a company in the business of collecting and recycling animal processing by-products. (TAC ¶¶ 3 & 4). Maqbool was responsible for overseeing a plant located in New Jersey and ensuring that plant equipment was sanitary and in good repair. (*Id.* ¶¶ 5 & 7). To that end, Maqbool helped maintain large condenser fans, also known as "Voss Condenser Fans," which

---

[1]      Plaintiffs are husband and wife and will hereinafter be referred to by their first names.

were located on the roof of the New Jersey plant. (*Id.* ¶¶ 5–6). The blades on the fans were approximately eight feet long, and the fans "[we]re temperature controlled and automatically turn[ed] on every time a condenser hit[] sixty-five (65º) degrees. . . ." (*Id.* ¶¶ 8–9). To prevent the fan from automatically turning on—for example, in order to conduct a repair—the fan must be "de-energized." (*Id.* ¶ 10). As is explained in further detail below, Plaintiffs allege that the procedure used by Darling to deenergize the fan for repair involved two steps. (*Id.*). First, a coworker would deenergize the fan via computer from the control room, letting the repairing employee know over radio when the deenergizing was completed. (*Id.* ¶ 11). Second, the repairing employee would manually deenergize the fan from the roof by engaging a disconnect switch to lock the fan. (*Id.*). Plaintiffs allege that at the time of the incident, Darling used electrical bypasses which prevented employees from manually deenergizing the fans from the roof—the alleged second step of the procedure. (*Id.* ¶¶ 20–23). On or about April 20, 2018, Maqbool suffered injuries while attempting to repair a fan that became energized while he was working on it. (*Id.* ¶¶ 12–14). Plaintiffs allege that Maqbool completed both steps of the deenergizing procedure, and that the electrical bypass prevented the second step from working properly. (*Id.* ¶¶ 12–14 & 20–23).

**B.**   **Procedural History**

Plaintiffs now bring claims for negligence and loss of consortium against Darling. This case originated in the Superior Court of New Jersey, Middlesex County, in March 2020. (D.E. No. 1 ¶¶ 1–2). On April 23, 2020, Darling removed the matter to federal court based on diversity jurisdiction. (*Id.* ¶¶ 2 & 8–14). On May 14, 2020, Darling first moved to the dismiss the Complaint. (D.E. No. 4). But the motion was thereafter administratively terminated on June 15, 2020, because Plaintiffs had indicated they would amend. (D.E. No. 11). On June 22, 2020,

Plaintiffs filed the First Amended Complaint (D.E. No. 12 ("FAC")).[2] On July 17, 2020, Darling moved to dismiss the FAC. (D.E. No. 17).

On March 19, 2021, the Court granted Darling's motion and dismissed the FAC without prejudice. (D.E. No. 34 ("First Opinion")).[3] As previously construed by the Court, the FAC had alleged that when repairing a fan

> Darling . . . requires employees to deenergize the condenser personally, prior to conducting any repairs on the fan. But because the fans are on the roof, and because the control room is not, Darling allegedly "created an alternative method, to avoid delays." That method allowed an employee to wait on the roof while a second employee deenergized the condenser from the control room and informed the first employee of such through a two-way radio.

(*Id.* at 2). Plaintiffs further alleged that on the day of the accident, Maqbool followed the "alternative method": Maqbool entered a fan after receiving clearance from a co-worker over the two-way radio, and he was struck by the fan after it reenergized and turned on. (*Id.*). Plaintiffs also alleged that Darling had, before the accident, (i) disconnected a vibration switch that automatically shut off the fans after they went off-balance; (ii) failed to replace a broken guard that prevented people from getting into the fans; and (iii) initiated an electrical bypass on the fans, which ensured the fans were always on and functioning and prevented employees from manually turning them off from the roof. (*Id.* at 2–3). Plaintiffs alleged that Darling received safety complaints from workers about the location of the fans, the broken guards, the vibration switch, and the electrical bypass. (*Id.* at 3). Finally, Plaintiffs alleged that the Occupational Safety and Health Administration ("OSHA") cited Darling for the accident. (*Id.*).

---

[2] Plaintiffs also asserted products liability claims in the FAC against Siemens Corporation, the manufacturer of the fans; those claims were dismissed by stipulation. (D.E. No. 31).

[3] *Paracha v. Darling Ingredients Inc.*, No. 20-4902, 2021 WL 1051728 (D.N.J. Mar. 19, 2021).

3

In its First Opinion, the Court explained that Darling was immune from suit under the New Jersey Workers' Compensation Act ("WCA"), N.J.S.A. § 34:15-8, because Plaintiffs did not plausibly allege that Darling committed an "intentional wrong" that caused Maqbool's injuries. (First Opinion at 4–10). An "intentional wrong," the Court explained, must be one that (i) creates a "virtual certainty" of bodily injury or death and (ii) causes an injury (a) that is not merely a fact of life in industrial employment and (b) that is plainly beyond anything the legislature intended to immunize. (*Id.* at 5). Second, the Court found that Plaintiffs' allegations concerning the broken guard and disconnected vibration switch were irrelevant because Maqbool's injuries, as alleged, did not have anything to do with either. (*Id.* at 7–8). Third, the Court explained that Plaintiffs' relevant allegations were as follows:

> Darling (i) prevented employees from turning off the fans while on the roof; (ii) permitted employees to rely on one another to deenergize the condenser prior to working on the fan; (iii) received complaints from employees in the preceding years about the location of the fans and their inability to manually turn them off while on the roof; and (iv) received an OSHA citation for Maqbool's accident.

(*Id.* at 8). Fourth, the Court found that those allegations, taken as true, failed to overcome Darling's immunity from suit. (*Id.* at 8–10). The Court specifically stated that "the FAC d[id] not explain *how* these facts make it such that the alternative method to deenergizing the condensers"— whereby two employees work together through a two-way radio—"created a virtual certainty of injury." (*Id.* at 8). The Court also explained that "[t]he FAC claim[ed] the accident occurred because of the negligent act of a co-worker," and the Court found that "[a] co-worker's negligent act is . . . a well-known risk in working in a plant or factory." (*Id.* at 9). The Court dismissed the FAC without prejudice. (*Id.* at 10).

4

On May 19, 2021, Plaintiffs filed their Second Amended Complaint (D.E. No. 37 ("SAC")). In an attempt to cure their prior pleadings, Plaintiffs maintained that Darling employees followed the following "practice and procedure" when repairing the fans:

> [T]he employee assessing and making such repair waited on the roof with the Fan while a second employee in the control room deenergized the Fan. After confirmation from the co-worker in the control room that the Fan was de-energized, the employee working on the Fan from the roof would also disconnect and lock the fan before commencing his/her work. The ability to disconnect and lock the Fan is meant to add a layer of protection to any employee, including Mr. Paracha, while working on the Fan to ensure that the Fan would not reenergize. This process was referred to as Defendant Darling's "Lock Out/Tag Out Procedure."

(SAC ¶ 11). There thus appears to have been two steps alleged in the SAC to deenergize the fan: first, a co-worker deenergizes the fan from the control room; second, the repairperson locks and disconnects the fan from the roof. (*Id.*).

The SAC alleged that while Maqbool was on the roof preparing to fix a leak in a fan, a fellow employee indicated that he deenergized the fan from the control room. (*Id.* ¶ 12). Maqbool visually confirmed that the fan blades stopped, and Maqbool disconnected and locked the fan from the roof. (*Id.*). But while Maqbool was repairing the fan, the fan energized and struck him, causing him severe and permanent injuries. (*Id.* ¶¶ 13–14).

According to the SAC, the Lock Out/Tag Out Procedure did not work because Darling effectively disabled the second step of the procedure—whereby the employee on the roof, in this case Maqbool, locked and disconnected the fan. (*Id.* ¶¶ 17(c)–18). Indeed, Darling allegedly had employees install "electrical bypasses" which effectively disabled the fan disconnects. (*Id.*). And Darling effectively disabled the fan disconnects to allegedly obviate the need to conduct expensive repairs and to ensure "the Fans were always on and functioning" and would "run without interruption to Darling's business." (*Id.* ¶ 17(c)). Plaintiffs further alleged that, "due to the nature

5

of the electrical bypass," Maqbool "could not visually confirm which Fans (there were a total of six on the roof) had an electrical bypass and which did not." (*Id.* ¶ 18).

Plaintiffs claimed in the SAC that Maqbool should have "retain[ed] sole control" over disconnecting or deenergizing the fan so that he would have "know[n] with certainty that the Fan was off and would not activate when working on same." (*Id.* ¶ 21). They alleged that "[f]an disconnects are a recommended and necessary safety feature for every fan" and "provide the best protection against accidental start-up during service or inspection." (*Id.* ¶ 17(c)). "The very purpose of the employee's ability to disconnect and lock the Fan directly on the roof was to add a layer of protection to the employee working on the Fan from the roof, should there be the occasion where the Fan is not properly deenergized from the control room." (*Id.* ¶ 20).

Plaintiffs alleged in the SAC that Darling was on notice of the danger posed by the electrical bypasses and the fans. (*Id.* ¶ 22). They claimed that, prior to the incident, Maqbool and other employees complained about the location of the fans and the use of electrical bypasses. (*Id.* ¶ 23). And for about three or four years prior to the incident, employees had requested, out of concern for their safety, that the fans be replaced because of their safety conditions and age, the latter of which caused the fans not to operate as expected. (*Id.* ¶ 24).

Finally, Plaintiffs alleged in the SAC that OSHA cited Darling for Maqbool's incident. (*Id.* ¶ 25). Specifically, they claimed that OSHA cited Darling "for a serious type violation, per 29 CFR 1910.147(a)(2)(ii)(B): 'an employee was required to place a part of his or her body into an area on a machine or piece of equipment where work was actually performed upon the material being processed (Point of operation) or whereas associated danger zone existed during a machine operating cycle.'" (*Id.*). The OSHA investigation allegedly ended in a settlement whereby Darling agreed, among other things, to pay a fine and "to develop and implement a written procedure for

6

accessing and locking out the roof mounted condenser fans and to include employee training." (*Id.* ¶ 28).

Defendants again filed a motion to dismiss the SAC for failure to state a claim. (D.E. No. 39). In a second opinion (D.E. No. 55 ("Second Opinion")),[4] the Court granted that motion. (*Id.* at 11). The Court found that the SAC was still deficient in alleging how Darling's actions in relation to the incident in question amounted to an intentional wrong. (*Id.* at 10–11). Specifically, the Court noted that the SAC continued to depict the roof disconnect option as an *added* safety measure rather than one *required* to prevent the fans from re-energizing, and failed to allege how, even if the bypasses were in effect and the roof disconnect option was unavailable, the process of deenergizing the fans solely via a second employee in the control room created a "virtual certainty" of injury. (*Id.*). The Court dismissed the SAC without prejudice, but warned Plaintiffs that any further amendment would be their last chance. (*Id.* at 11).

Plaintiffs proceeded to file a third amended complaint. (TAC). The TAC does not differ greatly from the SAC in many relevant respects. First, the TAC relabels the two-step procedure described above: before describing the procedure, the SAC stated that "[t]here was an *accepted practice and procedure* among Defendant Darling employees . . ." (SAC ¶ 11 (emphasis added)), while the TAC reads "[t]here was a two-step procedure at Defendant Darling to deenergize a Fan before commencing work on that Fan" (TAC ¶ 10). The TAC describes the procedure in much the same way as the SAC, but states that "[a]fter confirmation from the co-worker in the control room that the Fan was de-energized, the employee working on the Fan from the roof *must* also engage the disconnect switch and lock the Fan before commencing his/her work" (*id.* ¶ 11 (emphasis added)), in contrast to the SAC which stated that "the employee working on the Fan

---

4    *Paracha v. Darling Ingredients Inc.*, No. 20-4902, 2022 WL 909926 (D.N.J. Mar. 29, 2022).

from the roof *would* also disconnect and lock the fan before commencing his/her work" (SAC ¶ 11 (emphasis added)).

Second, the TAC also contains additional allegations concerning the alleged electrical bypass and the roof disconnect switch. Specifically, the TAC adds the allegation that "[h]ad the disconnect switch functioned properly, it would have been impossible for the Fan to become reenergized." (TAC ¶ 14). Further, the TAC alleges that

> by installing an electrical bypass, Defendant Darling disengaged a critical safety feature of the Fan—the disconnects. . . . By disenabling the disconnect, Defendant Darling effectively rendered its own 'Lock Out/Tag Out Procedure' useless. . . . Had Mr. Paracha been able to deenergize the Fans using the disconnect, the Fan would not have reenergized while he was working on it. Directly deenergizing the Fan by way of disconnect was the safest way to ensure the Fan would not accidentally start.

(*Id.* ¶¶ 21–22, 24). The TAC also adds that Darling's alleged failure to properly maintain the fans made the need for safety devices such as the disconnect switch "critical." (*Id.* ¶ 27).[5]

Finally, the TAC includes additional allegations concerning Defendant Darling's awareness of the danger the fans posed, including alleging that Darling (i) "received numerous complaints about the safety of the Fans from its employees"; (ii) "had knowledge of the dangerous consequences of operating the machinery without safety devices"; (iii) "intentionally removed and/or replaced the Fan in issue before OSHA could fully inspect" it; and (iv) "intentionally disengaged" the safety device of the disconnect switch in order to enhance profit, despite "kn[owing] harm to an employee was virtually certain to occur." (*Id.* ¶¶ 35–39).

---

[5] The TAC does not include the allegation, made in the SAC, that "[t]he ability to disconnect and lock the Fan is meant to add a layer of protection to any employee, including Mr. Paracha, while working on the Fan to ensure that the Fan would not reenergize." (SAC ¶ 11).

8

On December 15, 2022, Darling moved to dismiss the TAC for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[6]

## II.   LEGAL STANDARD

In assessing whether a complaint states a cause of action sufficient to survive dismissal under Rule 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018). "[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are all disregarded. *Id*. at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)). The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and a claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III.   DISCUSSION

Enacted in 1911, the WCA "accomplished a 'historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment.'" *Van Dunk v. Reckson Assocs. Realty Corp.*, 45 A.3d 965, 970–71 (N.J. 2012) (quoting *Millison v. E.I. du Pont de Nemours & Co.*, 501 A.2d 505, 512 (N.J. 1985)).

---

[6] Defendant initially filed its motion to dismiss the TAC on May 23, 2022. (D.E. No. 64). The Court administratively terminated the motion in light of ongoing settlement negotiations. (D.E. No. 79). Defendant renewed its motion to dismiss the TAC on December 15, 2022, (D.E. No. 83), and chose to rely on its previously submitted papers (D.E. No. 82). Those papers are located at Docket Entry Number 64. Thus, references to Defendant's motion refer to the re-filed motion at Docket Entry Number 83, but references to the accompanying brief are to Docket Entry Number 64-2.

"When, by either express or implied agreement, the parties have accepted the provisions of the [WCA], the agreement operates as an employee's surrender of other forms of remedies." *Id.* at 971 (citing N.J.S.A. § 34:15-8). "In exchange for immunity from liability, the [WCA] requires the employer to provide swift and certain payment, without regard to fault, to employees for workplace injuries." *Id.* Importantly, the remedies under the WCA are exclusive, unless an employee's injuries were caused by an "intentional wrong" committed by his or her employer. *See Mull v. Zeta Consumer Prod.*, 823 A.2d 782, 783 (N.J. 2003). Indeed, the WCA provides, in pertinent part, that "[i]f an injury or death is compensable under this article," an employer "shall not be liable to anyone at common law or otherwise on account of such injury or death . . . , except for intentional wrong." N.J.S.A. § 34:15-8.

The WCA does not itself define "intentional wrong." But in interpreting that term, the New Jersey Supreme Court has defined two conditions that must be satisfied "in order for an employer's act to lose the cloak of immunity":

> (1) the employer must know that his actions are substantially certain to result in injury or death to the employee, and (2) the resulting injury and the circumstances of its infliction on the worker must be (a) more than a fact of life of industrial employment and (b) plainly beyond anything the Legislature intended the Workers' Compensation Act to immunize.

*Laidlow v. Hariton Mach. Co.*, 790 A.2d 884, 894 (N.J. 2002); *accord Van Dunk*, 45 A.3d at 973. The first condition is the "conduct prong," and the second condition is the "context prong." *See Van Dunk*, 45 A.3d at 973. These prongs, the New Jersey Supreme Court has said, present "formidable" standards. *Id.* at 966.

With respect to the conduct prong, "[m]ere knowledge by an employer that a workplace is dangerous does not equate to an intentional wrong." *Id.* at 978. In other words, negligent or reckless conduct does not satisfy the conduct prong. *See Millison*, 501 A.2d at 514. Instead, "[a]n

10

intentional wrong must amount to a virtual certainty that bodily injury or death will result." *Van Dunk*, 45 A.3d at 978. The intentional wrong analysis "represents a conscious effort to impose severe restrictions on the exception, bringing it as close to 'subjective desire to injure' as the nuances of language will permit." *Millison*, 501 A.2d at 511. In determining whether the conduct prong has been satisfied, the fact finder must consider the totality of the circumstances, including the circumstances of the accident, the employer's involvement in it, prior accidents or close calls involving the same or similar circumstances, previous complaints of employees, defective safety devices and the employer's knowledge of such defects, safety devices that had been modified as more dangerous to enhance profit, past OSHA citations for same or similar conduct, and the employer's purposeful deceit of OSHA regulators. *Van Dunk*, 45 A.3d at 978–79 (collecting cases). Ultimately, and it bears emphasis, these factors are meant to determine whether there was a *virtual certainty* of injury, not whether there was an "exceptional wrong," a "reckless act," or "gross negligence." *Id.* at 972, 979.

The context prong is "related" to, and often "overlap[s] to great degree" with, the conduct prong. *Id.* at 979. Indeed, "the same facts and circumstances generally will be relevant to both prongs." *Crippen v. Cent. Jersey Concrete Pipe Co.*, 823 A.2d 789, 796 (N.J. 2003). However, the context prong presents a question of law for a court, "as the gatekeeper policing the [WCA's] exclusivity requirement," to determine whether "an employee's injury and the circumstances in which the injury is inflicted are 'plainly beyond anything the legislature could have contemplated as entitling the employee to recover *only* under the [WCA].'" *Van Dunk*, 45 A.3d at 980 (quoting *Millison*, 501 A.2d at 514).

Defendant argues that the TAC still does not plausibly plead an intentional wrong, failing to cure the deficiencies described in the Court's prior two opinions. (D.E. 64-2 ("Mov. Br.") at

11

15). In chief, Defendant argues that Plaintiffs "fail to assert any factual allegations to support their conclusory recitation of the 'substantial certainty' language affiliated with the workers' compensation intentional wrong exception" and "provide no factual allegations as to how Darling's purported act of directing electrical bypasses be installed on the disconnects on the roof of the facility, created a substantial certainty that injury would occur." (*Id.* at 27–28). Defendant highlights the fact that Plaintiffs appear to concede in their TAC that "procedures were in fact available, where an employee could completely de-energize[] the Fan from the control room regardless of whether the fan had a bypass." (*Id.* at 28).[7]

In response, Plaintiffs argue that the facts in the TAC plausibly allege that Darling committed an intentional wrong. (D.E. No. 67 ("Opp. Br.") at 9–17). Plaintiffs rely mainly on the allegations in the TAC that: (i) Darling disabled a "critical" safety device (the disconnect switch on the roof) via electrical bypass in order to enhance profit (TAC ¶¶ 17–21); (ii) an OSHA inspection following Maqbool's injury demonstrated that the fan was destroyed after the incident (before the OSHA inspection) due to supposed catastrophic failure the day after the incident (*id.* ¶¶ 28–29, 37); and (iii) previous complaints were made to Darling regarding the safety of the fans and the use of the electric bypass (*id.* ¶ 27). Plaintiffs argue that "[t]he removal of [the roof disconnect], and not the process of two employees working together, created virtual certainty of injury." (Opp. Br. at 13).

For the following reasons, the Court agrees with Defendant and finds that the TAC fails to cure the Court's central holdings in dismissing the FAC and the SAC.

---

[7] In its current motion, as with its previous motion to dismiss (D.E. No. 39-2 at 2–4), Defendant points out various contradictions between the amended complaints (Mov. Br. at 2–7). However, because the Court finds (as detailed below) that even putting aside any contradictions and taking the TAC's claims on their face, the TAC fails to state a claim, the Court declines to address this argument.

The Court initially found the FAC inadequate regarding the "conduct prong," by failing to explain how the deenergizing method allegedly employed by Darling, whereby two employees work together through a two-way radio, "created a virtual certainty of injury." (First Opinion at 8). The Court later found that "[t]he SAC does not cure that defect. Instead, the SAC appears to concede the opposite: '[t]he very purpose of the employee's ability to disconnect and lock the Fan directly on the roof was to *add* a layer of protection to the employee working on the Fan from the roof, *should there be the occasion where the Fan is not properly deenergized from the control room*.'" (Second Opinion at 10 (quoting SAC ¶ 20 (alteration in original))). The Court emphasized that the SAC "does not allege why or how the process of deenergizing the fan from the control room created a virtual certainty of injury. Instead, Plaintiffs insist there should have been an additional layer of protection." (*Id.* (citing SAC ¶¶ 11–12 & 20)).

The Court additionally found that the SAC did not adequately allege the "context prong," because the SAC, like the FAC, still alleged that the accident was caused by a coworker's negligence, and "[a] co-worker's negligent act is . . . a well-known risk in working in a plant or factory." (*Id.* (citing *Calavano v. Fed. Plastics Corp.*, No. A-0353-09T1, 2010 WL 3257784, at *6 (N.J. Super. Ct. App. Div. Aug. 18, 2010))). While Plaintiffs denied negligence on the part of Maqbool's co-worker, the Court found that the SAC indicated that "disconnecting and locking the fan would only have added another layer of protection in the event the fan was 'not properly deenergized from the control room.'" (*Id.* at 10 (citing SAC ¶ 20)). The Court stated that "[i]f the accident occurred because the deenergizing process was faulty—because it did not or could not work as a result of something other than a co-worker's negligence—then Plaintiffs must plead as much." (*Id.* at 10–11). In dismissing without prejudice, the Court added: "[t]he Court will permit Plaintiffs one final opportunity to amend their pleadings to plausibly allege that the procedure

13

allegedly in place at the time of the accident, whereby one employee relied on another to deenergize the fan from the control room, constitutes an intentional wrong under New Jersey law." (*Id.* at 11).

Despite this guidance, Plaintiffs have failed to remedy the deficiencies addressed in the Second Opinion. The TAC is devoid of allegations explaining why the control-room deenergizing procedure was in and of itself so unsafe that it created a virtual certainty that injury would occur if it were followed while electrical bypasses allegedly prevented Maqbool from using the disconnect switch on the roof. This is critical: without allegations regarding why this first step was itself so unsafe as to be virtually certain to cause injury, the safety of the second step is simply irrelevant. While the TAC contains some allegations which may hint at this point—stating that employees "*must*" use the disconnect switch as part of the two-step process (TAC ¶ 11), calling the disconnect switches "critical" to safety (*id.* ¶ 21), and alleging that the switch would have prevented the fan from re-energizing absent the bypass (*id.* ¶ 24)—they are all vague and/or conclusory, and thus insufficient. *See Shorter v. Quality Carrier*, No. 14–4906, 2014 WL 7177330, at *3 (D.N.J. Dec. 16, 2014) ("Plaintiffs' 'threadbare recital' of the elements of an intentional wrong, coupled with legal conclusions, cannot survive Defendants' motion to dismiss."). Calling a safety device "critical," and stating that it "must" be used, without explaining why, is not enough—it is merely conclusory.

Plaintiffs' continued focus in the TAC on the danger of the electrical bypass and its effect on the second step of the procedure is misplaced. The electrical bypass—and the second step in its entirety—is irrelevant if the first step of the lockout procedure was sufficient to safely deenergize the fan if done properly. *See Shorter*, 2014 WL 7177330, at * 3 ("Although Plaintiffs contend that Defendants 'rendered ineffective those protective devices or safeguards originally

installed or provided for the aforementioned tank trailer and valves,' this allegation, without an allegation of a deliberate intent to injure or with knowledge that this act was substantially certain to lead to injury, is not enough to escape the exclusivity provision of the WCA."). In their opposition brief, Plaintiffs argue that "Plaintiff asserts that he received clearance over the two-way radio from his co-worker, Johnny Medic, in the control room that the Fan was completely de-energized and nonetheless, this Fan reenergized. This demonstrates that even if the first-step is followed, the Fan *could* become reenergized. This fact, taken as true, demonstrates the fundamental importance of the safety feature which Defendant disengaged." (Opp. Br. at 13 (emphasis added)). But merely because the fan *could* become reenergized if the first step of the procedure was completed perfectly (a fact that the Court is not convinced Plaintiffs have plausibly alleged) does not mean there is a virtual certainty of that occurring. *See Van Dunk*, 45 A.3d at 978 ("An intentional wrong must amount to a virtual certainty that bodily injury or death will result. A probability, or knowledge that such injury or death 'could' result, is insufficient." (internal citation omitted)).

The strongest allegation supporting the conduct prong of the intentional wrong claim contained in the TAC is that "[b]y disenabling the disconnect, Defendant Darling effectively rendered its own 'Lock Out/Tag Out Procedure' useless." (TAC ¶ 22). But again, this is conclusory. Plaintiffs do not in any way explain or provide any allegations as to how the procedure was useless without the disconnect—in other words, how the first step was not sufficient on its own. And the TAC continues to refer to the disconnect switch as "the *safest way* to ensure the Fan would not accidentally start" (*id.* ¶ 24 (emphasis added)), rather than the *only* safe way. Additionally, while the TAC includes allegations that complaints were made about the safety of the fan and the use of electric bypasses (*id.* ¶¶ 26–27), it continues to fail to allege that safety

15

complaints were made about the process of deenergizing the fan from the control room such that Darling was aware of a virtual certainty of injury if the bypasses prevented the use of the roof disconnect switch.[8]

The TAC, as with the FAC and SAC before it, does not plausibly allege that the deenergizing procedure it describes—even with the electrical bypass allegedly preventing the use of the disconnect switch—created a "virtual certainty" that the fans would reenergize and cause injury. Thus, it fails to allege that Darling committed an intentional wrong in accepting and/or advocating for the use of the procedure, which is necessary to overcome Darling's immunity from suit under the WCA.[9] The TAC is therefore dismissed for failure to state a claim. Because the Court noted in its previous opinion that Plaintiffs would be allowed only "one final opportunity to amend their pleadings" (Second Opinion at 11), this dismissal is with prejudice.

### IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** the motion to dismiss the TAC. (D.E. No. 58). The TAC is dismissed *with prejudice*. An appropriate Order accompanies this Opinion.

Dated: September 27, 2023

Esther Salas, U.S.D.J.

---

[8] Plaintiffs additionally argue that the OSHA inspection following the incident "lends support to Plaintiff's contention that the condition of the Fans created a virtual certainly [sic] of injury." (Opp. Br. at 12). The Court is not convinced. As far as the Court can tell, Plaintiffs are insinuating that the fact that the fan was destroyed before OSHA could inspect it was suspicious, implying Darling knew about the alleged certainty of injury created by the electrical bypasses. This allegation is simply not enough on its own to establish that the entire process—including the control-room deenergizing and the rooftop-locking—was virtually certain to cause injury while the electrical bypass was supposedly in effect.

[9] Plaintiffs make various arguments as to why caselaw demonstrates that defendants such as Darling commit an intentional wrong when they remove a safety device. (Opp. Br. at 11–12). But they made these arguments to the Court before (D.E. No. 42 at 12–14), and the Court remains unconvinced. As explained above, the electrical bypass allegedly ordered by Darling is irrelevant if the first step of the lockout procedure was sufficient to safely deenergize the fan if done properly. Accordingly, Plaintiffs' cases regarding the effects of removing a safety device are unavailing.